Argued 18 June; decided 7 July, 1902.

### REED v. DUNBAR.

[69 Pac. 451.]

41  509
46  332

MANDAMUS—EFFECT OF DEMURRER—JUDICIAL NOTICE.

1. The question whether an office has been abolished may be determined on appeal from an order sustaining a demurrer to an alternate writ of mandamus to compel the payment of the salary of the official, though the writ alleges that the officer is duly qualified, commissioned and acting, as the court will take judicial notice of the statute.

FISH LEGISLATION—REPEAL BY IMPLICATION—STATUTES.

2. Under the familiar rule that where there are repugnant acts upon the same subject, and the latest one revises the subject in such a way as to plainly evidence a legislative intention to substitute it for the earlier law or laws, the latest law repeals the others by implication, it must be held that the law of 1901 relating to fishes and fishing (Laws, 1901, pp. 328, 349), repealed the law of 1898 in toto.

CONSTITUTIONAL LAW—DELEGATION OF LEGISLATIVE FUNCTIONS.

3. The power to appoint to a public office is often exercised by legislative bodies, but it is not a constitutional power which cannot be delegated, like the power to make laws, and an act creating a board with power to appoint certain officers and agents is not void because it attempts to delegate constitutional powers; for example, the law of 1901, regulating the fish industry of the state and creating a Board of Fish Commissioners, is not unconstitutional, as being a delegation of legislative powers, in authorizing the commissioners to appoint a master fish warden.

From Marion: REUBEN P. BOISE, Judge.

This is a mandamus proceeding by F. C. Reed against F. I. Dunbar, to compel the defendant, as secretary of state, to draw a warrant in favor of the plaintiff for salary alleged to be due him as fish commissioner for the month of March, 1901, and for expenses which it is asserted he incurred in the discharge of his duties during the same time. The alternative writ alleges, in substance, that in April, 1899, the plaintiff was appointed fish commissioner, in pursuance of the provisions of an act of the legislature, approved October 18, 1898, for the term ending October, 1902, at an annual salary of $2,500, payable quarterly,

and was allowed necessary expenses incurred in the performance of his duty, not to exceed $1,700 per annum; that in April, 1901, he presented to the defendant, as secretary of state, his claim for services rendered during the quarter ending March 31, 1901, amounting to $625, salary, and $43.10, expenses; that the defendant refused to allow such claim, or any part thereof, except an amount sufficient to cover his salary and expenses for the months of January and February; that the plaintiff is the duly qualified, commissioned, and acting fish commissioner of the state; and that there is still due him the sum of $208.33 as salary, and $18.80 as expenses incurred in the performance of his duty. A demurrer to the alternative writ was sustained on the ground that the office of fish commissioner was abolished by the legislative assembly of 1901, and ceased to exist on the 1st of March of that year.                    AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Cicero M. Idleman.*

For respondent there was a brief and an oral argument by *Mr. D. R. N. Blackburn,* Attorney General, and *Mr. Charles W. Fulton.*

MR. CHIEF JUSTICE BEAN, after stating the facts, delivered the opinion of the court.

1. It is insisted that the question of the repeal of the act under which the plaintiff was appointed cannot be considered, because the case comes here on demurrer to the alternative writ, which alleges that he is the duly qualified, commissioned, and acting fish commissioner of the state. But we are of the opinion that, if the act has been repealed and the office abolished, the court will take judicial notice of that fact. And moreover, if the judgment is to be put upon a technical ground, it is by no means certain that the alternative writ states a cause of action. By a recent act of the legislature (Laws, 1901, p. 293) it is provided that no warrant shall be drawn by the secretary of state in payment of any claim against the state unless an appropriation has first been made for the payment thereof; and it is doubtful

whether an alternative writ of mandamus to compel the secretary
of state to draw a warrant in payment of such a claim states a
cause of action, unless it alleges that an appropriation has been
made for the payment thereof.  We prefer, however, to put the
case upon the real question involved, rather than upon mere
technical grounds.

2. In 1898 the legislature passed an act to provide for the
propagation and protection of chinook and other species of sal-
mon, sturgeon, and food fishes in the rivers and waters of the
state; to license and regulate those engaged in taking fish, the
devices and appliances used for that purpose, and all persons
engaged in canning or dealing in fish; and to provide for the
appointment of a fish commissioner and deputies, the defining
of their duties, and the fixing of their compensation: Laws,
1898, p. 37.  This act consists of 44 sections, defines the close
season, makes it unlawful to catch or take fish, or to have in
possession, sell, or offer for sale or transportation, or to trans-
port, any fish caught during such season; provides for the ap-
pointment by the governor of a fish commissioner for a term
of four years, at an annual salary of $2,500, payable quarterly;
makes it the duty of the fish commissioner to devote his time
to the fishing industry of the state; gives him management of
the state hatcheries; and requires him to see that all laws for
the protection, preservation, and propagation of food fishes are
enforced; requires him to issue all licenses for fishing, packing,
or dealing in fish, and pay the money received therefor over to
the state treasurer, to the credit of the hatchery fund; author-
izes him to propagate and stock the various streams of the state
with salmon and other food fishes, and for that purpose gives
him power to close any stream.  In 1901 the legislature passed
another act, entitled "An act to provide for the better protection
of chinook, steel-heads, and all other anadromous species of
salmon and other fish; and for the better protection of the fishing
industry in this state and the regulation and control thereof; to
regulate the time and appliances for the taking of the same;
to provide for the creation of a board of fish commissioners and
other officers pertaining to the fishing industry in this state;

to provide for the construction and maintenance of fish hatcheries in the State of Oregon and adjoining states; and to repeal certain laws in this act designated, and all acts and parts of acts in conflict therewith": Laws, 1901, p. 328. This act consists of 54 sections, and covers the entire subject of the fishing industry of the state. It contains, however, no repealing clause, and the question for decision is whether it repeals the act of 1898 by implication.

It is· a familiar rule that repeals by implication are never favored, and, when there are two acts upon the same subject, effect will be given to both, if possible. But when they are repugnant, so that both cannot stand, or if the new statute revises the whole subject-matter of an existing law, and is plainly intended as a substitute therefor, it will operate as a repeal of the old law, even though it contains no express provision to that effect :· *Little* v. *Cogswell,* 20 Or. 345 (25 Pac. 727) ; *Continental Ins. Co.* v. *Riggen,* 31 Or. 336 (48 Pac. 476) ; *Ex parte Ferdon,* 35 Or. 171 (57 Pac. 376). If, therefore, the act of 1901 revised the whole subject embraced in the act of 1898, and was intended as the final expression of the legislative will, it operated as a repeal thereof, although it contains no express words to that effect. A glance at its provisions will show that it was so intended. It defines in detail the close season in the various streams; provides a penalty for catching fish during such season; regulates the construction and maintenance of traps, weirs, and other fixed appliances for catching fish; creates a board of fish commissioners, consisting of the governor, secretary of state, and state treasurer; makes it the duty of this board to appoint a master fish warden, one deputy fish warden, and water bailiffs; defines the duties and compensation of such officers; requires and authorizes the board of fish commissioners created by the act to locate and provide for the construction of fish hatcheries, and to have general control thereof; requires all moneys received under the act to be paid into the hatchery fund, and used for hatchery purposes under their direction; and makes it the duty of the master fish warden to issue all licenses for fishing, packing, or dealing in fish; requires him to keep a record thereof,

and make a detailed report to the board annually; authorizes the board of fish commissioners to propagate and stock the various waters and streams of the state with salmon and other food fishes, and, to that end, empowers them to prohibit the taking of fish from such streams. In short, it is manifestly intended to impose upon the board of fish commissioners and the officers appointed by them the duties theretofore required of the fish commissioner. Under the well-settled rules of statutory construction, it therefore operated as a repeal of the former act upon the subject.

It is argued that the striking out by the legislature of the repealing clause of the act of 1901, and the passage of a separate act at the same session for the payment, out of the moneys collected by the fish commissioner, of a bounty for killing seals and sea lions (Laws, 1901, p. 156), manifests a purpose not to abolish that office. The legislative journals show that the bill as it passed the house of representatives was a substitute for the original bill, and contained a section repealing certain laws which had already been repealed by the act of 1898: House Jour. 1901, p. 792. This section was stricken out by the senate (Sen. Jour. 1901, p. 799), but this does not indicate an intention not to make the act of 1901 a substitute for that of 1898. The act for the payment of a bounty for killing seals, sea lions, etc., provides, in substance, that a sum not to exceed $5,000 a year, out of the moneys paid into the state treasury by the fish commissioner, shall be placed in a separate fund, to be known as the "Fishery Bounty Fund," out of which there shall be paid a bounty for killing the animals named. The act further provides that any one killing or causing to be killed any of the animals for which the bounty is given shall make proof thereof before the fish commissioner, who shall issue to such person a certificate, as evidence of his right to receive from the state treasury the amount of the bounty, upon the presentation of which the secretary of state is required to issue a warrant on the fishery fund for the amount of the certificate. The evident purpose of this law was to provide for the payment of the

41 OR.—33.

bounty out of the money received for licenses and fines under the act regulating the fishing industry in the state, and that persons entitled to payment from such fund should make proof thereof to the officer charged with the duty of enforcing the fishing laws. It is therefore quite probable, under the rule that, where the subject-matter and general intent of a legislative act is once ascertained, words may be modified, altered, or supplied so as to carry out such intention, that the words "fish commissioner" will be construed to mean "master fish warden": Sutherland, Stat. Const. § 218. But however that may be, it cannot, we think, be said that the passage of the bounty act indicated the intention of the legislature to preserve the office of fish commissioner separate and distinct from that of master fish warden, as provided in the act of 1901.

3. It is also argued that the act of 1901 is unconstitutional and void because it delegates to the Board of Fish Commissioners the power and authority to appoint a fish warden. It is undoubtedly true that the legislature cannot delegate powers conferred upon it by the constitution, but the appointment to an office is not one of such powers. The appointment to public office may, under certain circumstances, be made by the legislature, but it is not a duty imposed upon it by the constitution. The rule invoked refers to the lawmaking power. Every law, after it is enacted, however, must be executed by some one charged with that duty; and, unless the constitution otherwise especially directs, the legislature may vest such power in a board or commission, and give to that board or commission the right to appoint subordinate officers or agents to carry out the legislative will: *State ex rel.* v. *George,* 22 Or. 142 (29 Pac. 356, 16 L. R. A. 737, 29 Am. St. Rep. 586) ; Cooley, Const. Lim. (5 ed.) 135.

We are of the opinion, therefore, that the law of 1901 is valid, and that it operated to repeal the act of 1898 under which the plaintiff was appointed. The judgment of the court below will therefore be affirmed.          AFFIRMED.